# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ACHERON MEDICAL SUPPLY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. 1:15-cv-1510-WTL-MPB |
| | ) | |
| COOK INCORPORATED, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT AND RELATED MOTIONS

This cause is before the Court on the Plaintiff's Motion for Partial Summary Judgment on the Complaint and for Summary Judgment on the Counterclaim (Dkt. No. 53) and the Defendants' motion for partial summary judgment (Dkt. No. 56). The motions are fully briefed and the Court, being duly advised, **GRANTS** the Defendants' motion and **DENIES** the Plaintiff's motion for the reasons set forth below. In addition, the Court **GRANTS** the Plaintiff's Motion for Leave to Amend Its Appendix of Evidence in Support of Its Motion for Partial Summary Judgment (Dkt. No. 73) and **DENIES** the Defendants' motion to file a surreply (Dkt. No. 79), as the issues addressed therein ultimately are not material to the Court's ruling.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor.").  When the Court reviews cross-motions for

summary judgment, as is the case here with regard to the Plaintiff's claims, "we construe all

inferences in favor of the party against whom the motion under consideration is made." *Speciale*

*v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (quotation omitted).

"'[W]e look to the burden of proof that each party would bear on an issue of trial.'" *Diaz v.*

*Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life*

*Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).  A party who bears the burden of proof on a

particular issue may not rest on its pleadings, but must show what evidence it has that there is a

genuine issue of material fact that requires trial.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d

892, 901 (7th Cir. 2003).  Finally, the non-moving party bears the burden of specifically

identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d

713, 723 (7th Cir. 2001).

## II.  <u>FACTS OF RECORD</u>[1]

On July 24, 2014, Defendant Cook Medical LLC ("Cook") and Plaintiff Acheron

Medical Supply, LLC ("Acheron") entered into a five-year Distribution Agreement (the

"Agreement").  Pursuant to the terms of the Agreement, Acheron was to serve as a distributor (or

reseller) of designated medical devices and products to the Department of Defense Medical

Centers ("DOD") and the Veterans Administration ("VA").  Specifically, the Agreement stated

that Acheron was appointed as Cook's exclusive distributor to the DOD and VA for the products

---

[1]The parties disagree regarding which facts are material to the resolution of the issues
before the Court.  The Court has included in this section the properly supported facts asserted by
the parties that are necessary to orient the reader and that serve as a basis of the parties'
arguments, even though ultimately some of them are not material to the Court's ruling.
Additional material facts are included in the Court's discussion where relevant to the analysis.

and devices of Cook's Endoscopy business unit and a non-exclusive distributor for the products

of its other business units.  The Agreement provides that:

> This Agreement and any instrument, document, plan or procedure incorporated
> into this Agreement by reference shall constitute the entire Agreement between
> the parties as to the subject matter hereof and supersedes all prior oral or written
> agreements as to such subject matter. No representations other than those
> contained herein are made by either party to the other.

Dkt. No. 1-1 at 11-12.  It further provides that "[n]o amendment, modification, or addition to this

Agreement shall be binding on the parties unless reduced to writing and duly executed by [Cook]

and [Acheron]." *Id.* at 9.

Acheron asserts that its sales to the DOD were to be made primarily through a federal

Multi Award Schedule known as a Distribution and Pricing Agreement ("DAPA").[2]  DAPAs are

awarded by the DOD's Defense Logistics Agency ("DLA") and are one of the DOD's preferred

means of procurement.[3]  Under a DAPA, product prices negotiated by a medical manufacturer or

supplier will be honored by the DOD's prime vendors to supply those products to the DOD.

Both Cook and Acheron were DAPA holders.  Prior to entering into the Agreement, Acheron

had downloaded the Endoscopy products listed on Cook's DAPA onto Acheron's DAPA, and

Acheron's DAPA was approved by the DOD's Defense Logistics Agency ("DLA").  Since a

manufacturer's products can be listed on only one DAPA, in order for Acheron to make sales

---

[2]Cook disputes this characterization of a DAPA, asserting that "[a] DAPA is more like a
listing of approved vendors than a 'Multi-Schedule Award' or more properly a multiple-award
schedule."  Dkt. No. 70 at 3.

[3]In response to this assertion in Acheron's statement of facts, Cook states that "the DOD
can and does make purchases outside of the DAPA through other contracting mechanisms, and
Acheron has not established that DAPA sales are the 'primary' mechanism for such purchases."
Dkt. No. 70 at 3.  Acheron does not so allege, however; rather, it states that DAPAs "are *one of
the DOD's preferred means of procurement*" and that *Acheron's sales* to the DOD were to be
made primarily through a DAPA. Dkt. No. 54 at 3.  That said, the Court notes that the evidence
cited by Acheron does not support its assertion that its sales were to be made primarily through a
DAPA.

through its own DAPA as distributor of Cook's products, Cook would have had to deactivate its own DAPA. Cook did not do so. The Agreement makes no reference to Cook transferring its DAPA sales to Acheron. Cook continued to make its own sales directly to the DOD.

The Agreement provided that Acheron was to obtain a Federal Supply Schedule contract ("FSS") and use it to sell Cook's products. An FSS is a type of Multi-Award Schedule contract, not unlike a DAPA, that the VA enters into with suppliers covering the sale of goods and services to the VA. An FSS is a preferred method of procurement by the VA and benefits the FSS holder because, once it is negotiated and executed, the VA lists the FSS holder's products in a national schedule at pre-set prices, which is available to all regional or local VA purchasers.

The Agreement contained the following provision:

> Cook will pay [Acheron] a commission of 3 percent (3%) of the purchase price on all Endoscopy Products sold by [Cook] in the Territory [defined in the Agreement as being the VA and the DOD] between March 1, 2014 and the date [Acheron] obtains its Federal Supply Schedule contract,[4] provided such Federal Supply Schedule is obtained by the end of the 2014 calendar year."[5]

Dkt. No. 1-1 at 5. The Agreement further set forth a commission schedule that would govern the commission paid to Acheron after it received its FSS "on products that are approved on its [FSS] contract at the time of the sale." *Id.* The commission schedule included commissions to be paid after an FSS contract was obtained by Acheron on any direct sales by Cook in the Territory, i.e., to the VA or the DOD.

---

[4]Cook paid Acheron a 3% commission on the relevant sales between March 1, 2014, and December 31, 2014.

[5]Cook cites to this provision as evidence that "[t]he Distribution Agreement contemplated that Acheron would obtain the FSS 'by the end of the 2014 calendar year.'" The Court does not read it as contemplating that the FSS *would* be obtained by that date, but rather as incentivizing Acheron to aim for that result.

Prior to execution of the Agreement, Acheron submitted its FSS solicitation (application) to the VA proposing 1,384 Cook Endoscopy products for placement on an FSS. The FSS procurement process is governed by various rules and regulations, including Title 48 of the Code of Federal Regulations (CFR) and the Federal Acquisition Regulations (FAR), specifically FAR Subpart 8.4 and FAR Part 38. The regulations state that they are designed to ensure that the VA receives a "fair and reasonable" price for the products to be purchased off the FSS. A person applying for an FSS therefore must follow a Commercial Sales Practices ("CSP") format as prescribed by federal regulation. *See* 48 CFR § 515.408 ("Solicitation provisions and contract clauses"). That format is designed to obtain appropriate and sufficient data so that the assigned government contracting officer can perform a price analysis, determine price reasonableness, and develop objectives for negotiations with respect to the FSS offeror's proposed pricing.

Pursuant to the applicable regulations:

> If you are a dealer/reseller without significant sales to the general public, you should provide manufacturers' information required by paragraphs (1) through (4) above for each item/SIN offered, if the manufacturer's sales under any resulting contract are expected to exceed $500,000. You must also obtain written authorization from the manufacturer(s) for Government access, at any time before award or before agreeing to a modification, to the manufacturer's sales records for the purpose of verifying the information submitted by the manufacturer. The information is required in order to enable the Government to make a determination that the offered price is fair and reasonable. To expedite the review and processing of offers, you should advise the manufacturer(s) of this requirement.

48 CFR § 515.408(b)(5). As a recently formed company, Acheron did not as yet have significant sales to the general public. Also, sales under the proposed FSS were anticipated to be well over $500,000. Therefore, the only way Acheron could obtain an FSS was if Cook allowed the VA access to its sales records. Cook executed a release that read as follows:

> Cook Medical, LLC agrees to provide access to the Veterans Administration those sales records between Cook and Acheron Medical Supply, our contracted vendor

> for medical devices purchased by VA Medical Centers, and all other needed
> records to support this contract award. The sole purpose of providing access to
> this information will be to verify information submitted by the Dealer/Reseller
> (Acheron Medical Supply) to the Veterans Administration.

Dkt. No. 68-4 at 2. The release is signed by Ronald Walters on behalf of Cook and dated June

10, 2014. Acheron asserts that a version of it was originally signed on that date, but language

was inserted and the new version, set forth above, was signed by Walters after the Agreement

was executed.

An FSS offer is reviewed by a contracting officer in the VA's Office of Acquisition,

Logistics and Construction. The contracting officer may request the VA Office of Inspector

General's (OIG) involvement in pre-award, post-award, and other requested reviews of FSS

proposals and contracts. The VA OIG's involvement is standard where, as here, a new

solicitation proposal with an estimated value of $500,000 or more is made by a reseller that does

not have significant commercial sales and who will be representing the manufacturer's

information.

On August 14, 2014, the VA OIG sent a letter to Cook asking Cook to submit certain

preliminary information as part of its pre-award review of the proposal submitted by Acheron.

The letter stated that its objective was to determine: (i) if the CSP and supporting data were

accurate and complete; (ii) whether offered prices were equal to or better than those offered to

the manufacturer's most favored customers; (iii) those customers who received discounts better

than those offered to the Government and the yearly volume or other consideration upon which

those discounts were based; (iv) the accuracy of information provided by Cook and Acheron

related to any rebate or incentive-type programs; and (v) the identity of those customers who

could serve as an appropriate tracking customer under the Price Reduction Clause. A list of

eleven items of preliminary information requested to start the review (hereinafter referred to as

the "OIG audit") was attached as Enclosure A to the letter. The VA OIG gave Cook until

September 5, 2014, to submit the requested information.[6]

Cook refused to supply the information requested by the OIG.  Acheron attempted to

determine if it could circumvent Cook's refusal to cooperate with the OIG audit, such as by

sharing selected pricing information with the contracting officer.  However, on December 28,

2014, the VA sent Acheron a letter that stated, in relevant part:

> Per the solicitation's instructions and Procedural Guideline #22 the offeror and
> the manufacturer must provide dated June 30, 2008, when a dealer/reseller does
> not have significant commercial sales, the Commercial Sales Practices (CSP) and
> other data.[7]  The dealer/reseller must also provide written authorization from the
> manufacturer for Government access to its sales records, in order for the
> Government to make a fair and reasonable price determination.  In your case,
> Acheron did provide the signed authorization letter from Cook on June 2014,
> stating that the manufacturer would provide Government access to its confidential
> sales data.
>
> Accordingly, the entire proposal package was forwarded to the Office of Inspector
> General (OIG) for pre-award review.  On August 14, 2014, the OIG forwarded a
> request for preliminary review materials to both Acheron and Cook with a
> suspense date of September 5, 2014.  The OIG did receive some of the originally
> requested information from both parties prior to the suspense due date.  On
> September 10, 2014, Acheron spoke with the contracting officer and indicated
> their desire to provide independent information outside of the OIG request.
> Acheron indicated that they were compiling that information for both Cook and
> themselves and would be sending it on for review.  After reviewing this provided
> information from both Cook and Acheron contracting does not feel comfortable
> that this information is enough to go outside of the OIG initial request.
>
> Acheron and Cook have been unwilling to provide a complete response to the
> information that was requested by the OIG.  The requested data is required to
> review sales data, discounts, evaluate business practices, establish a basis of
> negotiations, and facilitate a (subsequent) fair and reasonable pricing
> determination.  It is noted that, to date, Acheron and/or Cook have not provided
> their complete, requested information to the OIG for review.  Therefore, due to
> lack of information and non-receipt of required information in accordance with

---

[6]The parties dispute the amount of time and effort it would have taken Cook to provide
the requested information.  That fact is not relevant to the Court's resolution of the instant
motions.

[7]This nonsensical sentence is in the original letter.

CSP-1 Commercial Sales Practices Format, Point (5), this proposal package is a "no award" this proposal is being returned until that information can be provided for review of this award.

Please submit the required information in a timely manner for review of this contract award. . . . .

If you do not wish to continue with this package please let us know at your earliest convenience. In the future, if a manufacturer's CSP is required for review, please ensure the manufacturer's cooperation in advance and ensure both parties have sufficient time and resources to support the endeavor.

Dkt. No. 55-7.

After learning of the VA's letter, Walters sent an email to his superior, David Breedlove, Cook's Chief Financial Officer, advising that Cook "will need to provide the OIG access to all Cook Endoscopy pricing for their review and determination of what is fair and reasonable." After meeting with Breedlove, Walters instructed Acheron to resubmit the FSS application to the VA OIG, telling Wesley Pate of Acheron, "[w]e are good to go." Pate resubmitted the proposal to the VA.

Walters also sent two emails to officials of the VA, one dated January 27, 2015, and the other dated February 27, 2015, in which he expressed Cook's willingness to cooperate with the OIG audit. However, on or about March 23, 2015, at the direction of Breedlove, Walters informed Acheron that Cook had decided not to proceed with the OIG audit after all. In response, Pate sent an email to Walters suggesting that, in light of Cook's position, "[i]n order to avoid the look of unwillingness to submit to the government audit process again, we feel that the best solution would be for us to exchange out the Cook submitted products for another vendor that we represent. In doing so we can hopefully maintain our current status of resubmission for the FSS and avoid Cook rejecting to submit to the OIG requirements." Dkt. No. 55-6 at 4. Walters responded by email dated April 6, 2015, that he agreed with "your decision to utilize

another company to continue your acquisition of the FSS contract.  It only makes sense, as the

outlook for Cook at this point remains doubtful at best for the near term." *Id.* at 3.   In that email,

Walters also definitively stated that Cook would not be using Acheron to sell to the DOD, as

Cook would be doing that directly through its own DAPA.   Walters continued:

> However, as opportunities present themselves on fbo.gov and other venues within the VA segment we will gladly welcome an opportunity to work with you on setting up specific business opportunities as they present.  We have both spent a tremendous amount of time and money to date for a fraction of the expected outcomes.  We'll chalk that up as experience gained from lessons learned.  No harm no foul.
>
> Going forward, I think we would like to see Acheron bring Cook some significant value in the form of new business opportunities in the VA.  This will be the catalyst for getting together to strategize on business.  To be very honest with no national contract in play, no national network of contacts in the VA, limited exposure to the MSPV players and no regional or national sales force there is simply very limited resources from which to develop any meaningful strategy from.  I really like you guys and sincerely want to see you succeed, however I don't think we are at a point where we can have a meaningful relationship that will bring value to both parties.  As I stated on our last call, the contract remains in place and we will continue to consider business opportunities with Acheron under the terms and conditions of that agreement.

*Id.*  On April 14, 2015, Frank Lauch of Acheron sent a detailed email response to Walters

protesting Cook's abandonment of the OIG audit process and other actions by Cook.

On July 1, 2015, Cook issued Acheron a thirty-day notice to cure, stating that Acheron

was "in material breach of the following essential contractual obligations":

1) Inability to obtain a Federal Supply Schedule contract and use it to sell the Endoscopy products.
2) Inability to provide Cook access to a Federal Supply Schedule contract for Endoscopy products at pricing that it acceptable to Cook.
3) Failure to use its best efforts to promote, solicit and expand the sale of the Products within the Territory.

Dkt. No. 15-2.  Cook then terminated the Agreement on July 31, 2015, based on Acheron's

failure to cure.

## III.  DISCUSSION

In its Complaint, Acheron asserts a claim for breach of contract, alleging that Cook breached the Agreement by "prevent[ing] Acheron from making sales to DOD medical centers through its DAPA by deciding to withdraw authorization to Acheron to sell its products to the DOD medical centers, in direct and material breach of the Agreement that specifically designated Acheron as exclusive and non-exclusive distributor of Cook products to DOD medical centers" and by "prevent[ing] Acheron from obtaining an FSS contract by refusing to cooperate with an OIG audit that had been precipitated by Cook's own actions in preventing Acheron from demonstrating a history of sales of Cook products by not allowing Acheron to sell Cook's medical products to DOD medical centers in violation of the Agreement."   Dkt. No. 1 at ¶ 44, 45.  In its Answer, Cook asserts a counterclaim for breach of contract against Acheron.  Acheron moves for summary judgment as to Cook's counterclaim and summary judgment as to liability on its own breach of contract claim against Cook.  Cook moves for summary judgment as to Acheron's complaint.

### A.  Cook's Motion for Summary Judgment[8]

In its motion for summary judgment, Cook argues that Acheron's claim for breach of contract is without merit.  The Agreement provides, and the parties agree, that Indiana law governs this dispute.  Under Indiana law,

> Construction of the terms of a written contract generally is a pure question of law. The goal of contract interpretation is to determine the intent of the parties when they made the agreement.  This court must examine the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole.  If contract language is unambiguous, this court may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties intent from the four corners of the instrument.

_____

[8]The Court has considered all six of the parties briefs in making this ruling.

*Layne v. Layne*, 77 N.E.3d 1254, 1265 (Ind. App. 2017) (citations omitted).  In this case, the parties do not point to any ambiguity in the language of the Agreement, and the Court agrees that it is unambiguous.  Thus, the Court must begin its analysis by looking at the plain language of the Agreement.

Acheron asserts that Cook breached the Agreement by refusing to cooperate with the OIG audit, thereby preventing Acheron from obtaining an FSS.  As Cook points out, the Agreement contains no provision that expressly mentions an OIG audit.  However, Acheron argues that the force majeure clause in the Agreement obligated Cook to cooperate with the OIG audit.  The provision in question provides:

> Neither COOK nor any Affiliate nor [ACHERON] shall be liable for any delay or default caused by force majeure, including, without limitation . . . act of government or . . . agency . . . . The party affected by such a condition shall use every reasonable effort to correct or eliminate the cause which prevents performance and resume performance as soon as possible.

Dkt. No. 1-1 at 9.  The plain language of this term belies Acheron's argument.  *See Wisconsin Elec. Power Co. v. Union Pac. R. Co.*, 557 F.3d 504, 507 (7th Cir. 2009) ("[A] force majeure clause must always be interpreted in accordance with its language and context, like any other provision in a written contract, rather than with reference to its name.").  The provision does not require *both* parties to "use every reasonable effort to correct or eliminate the cause which prevents performance"; it requires "the party affected by such a condition" who, after correcting or eliminating the cause, must "resume performance as soon as possible."  It was Acheron's ability to perform its obligation under the contract that was caused by the government action, and therefore it was Acheron, not Cook, that was the "party affected" and on whom the force majeure clause imposed a duty.

Acheron also points to several legal principles that it argues required Cook to cooperate with its efforts to obtain an FSS contract, including cooperating with the OIG audit. First, Acheron characterizes Cook's position that its duties under the Agreement are determined by the language of the Agreement itself as "a maximalist position [that] perhaps might have had currency in some precincts in the 19th century," and argues, citing *Wood v. Lucy, Lady Duff-Gordon*, 22 N.Y. 88 (1917), that "the law has long since moved beyond that." However,

> Indiana courts zealously defend the freedom to contract. *Peoples Bank & Trust Co. v. Price,* 714 N.E.2d 712, 717 (Ind. Ct. App. 1999). "The existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract." *Zoeller v. E. Chicago Second Century, Inc.,* 904 N.E.2d 213, 221 (Ind. 2009) (citations omitted); *See also, New Welton Homes v. Eckman,* 830 N.E.2d 32, 35 (Ind. 2005) (Courts must not displace the contractually specified rights and remedies but "must leave to the individual parties the right to make the terms of their agreements as they deem fit and proper, and . . . enforce them as agreed upon.").

*State v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 160 (Ind. 2016). "Primitive" or not, Indiana law still very much eschews the practice of courts inferring duties that the parties have not included in their unambiguous contracts.

That said, Acheron is correct that Indiana has recognized the prevention doctrine, as the Indiana Court of Appeals has noted:

> [I]n *Hamlin v. Steward,* 622 N.E.2d 535, 540 (Ind. Ct. App. 1993), we recognized the rule that a party may not rely on the failure of a condition precedent to excuse performance where that party's own action or inaction caused the failure. When a party retains control over when the condition will be fulfilled, it has an implied obligation to make a reasonable and good faith effort to satisfy the condition. *Id.* "The *Hamlin* doctrine prevents a party from acts of contractual sabotage or other acts in bad faith by a party that cause the failure of a condition." *Indiana State Highway Comm'n v. Curtis,* 704 N.E.2d 1015, 1019 (Ind. 1998).

*Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 621 (Ind. App. 2000). That doctrine applies to a condition precedent in a contract, which is "a condition that must be performed

before the agreement of the parties becomes a binding contract or that must be fulfilled before the duty to perform a specific obligation arises." *Curtis*, 704 N.E.2d at 1018. "Such conditions are generally disfavored and must be stated explicitly within the contract. *Sasso v. Warsaw Orthopedic, Inc.*, 45 N.E.3d 835, 840 (Ind. App. 2015), *transfer denied,* 45 N.E.3d 1211 (Ind. 2016) (citing *Scott–Reitz Ltd. v. Rein Warsaw Assocs.,* 658 N.E.2d 98, 103 (Ind. App. 1995)); *see also Krukemeier v. Krukemeier Mach. & Tool Co.*, 551 N.E.2d 885, 889 (Ind. Ct. App. 1990) ("Conditions precedent are disfavored and must be stated explicitly."). "When the required action to be taken is an integral part of the contract, it is not a condition precedent." *Sasso*, 45 N.E.3d at 840. In this case, the Court is not convinced that the Agreement's requirement that Acheron obtain an FSS contract is, in fact, a condition precedent, rather than an "integral part of the contract." *Cf. Town of Plainfield v. Paden Eng'g Co.*, 943 N.E.2d 904, 915 (Ind. Ct. App. 2011) (noting that a condition precedent was created by the following language: "the Surety's obligation under this Bond shall arise after . . . ").

Even assuming that it is a condition precedent, as the parties appear to, the Court disagrees that the prevention doctrine imposed a duty on Cook to submit to the OIG audit. While Acheron cites to the Restatement (Second) of Contracts § 245 as support for its argument, the comment to § 245 states that "[t]he rule stated in this Section only applies, however, where the lack of cooperation constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court." Similarly, Restatement (Second) of Contracts § 225, also cited by Acheron, makes it clear that "non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur."

> When one party chooses to use the institution of contract to induce the other party to cause an event to occur, he may do so by making the event a condition of his own duty (Introductory Note to this Topic). Or he may do so by having the other party undertake a duty that the event occur. Or he may do both. But, as Subsection

> (3) makes clear, *a term making an event a condition of an obligor's duty does not of itself impose a duty on the obligee and the non-occurrence of the event is not of itself a breach by the obligee.* Unless the obligee is under such a duty, the non-occurrence of the event gives rise to no claim against him. The same term may, however, be interpreted not only to make an event a condition of the obligor's duty, but also to impose a duty on the obligee that it occur. And even where no term of the agreement imposes a duty that a condition occur, the court may supply such a term. See § 204.

*Id.* (emphasis added). This idea also is found in Williston's treatise, which notes that "there is no prevention when the conduct which allegedly prevented performance was permissible under the terms of the contract." 13 Williston on Contracts § 39:11 (4th ed.). To illustrate this principle, Williston cites to *Whitt v. Godwin*, 139 S.E.2d 841 (Va. 1965), which he summarizes as follows:

> Another case illustrating the principle that there is no prevention when the conduct which allegedly prevented performance was permissible under the terms of the contract dealt with a contract under which the plaintiff promised to relinquish his right to acquire the stock of a corporation in which the defendant was the principal stockholder in consideration of the defendant's promise to return the $12,000 which the plaintiff had paid toward the purchase price of the stock. The money had been paid to a mortgage company, and the defendant was having difficulty getting it back. He allegedly requested a release from the plaintiff, which was refused for various reasons. The court summarized the defendant's argument:

> > In his grounds of defense [the defendant] admitted the execution of the contract, but asserted that [the plaintiff] wrongfully prevented him from collecting $6,000 of the $12,000 which he sought from [the mortgage company]; that he was thus excused from performance of a portion of the contract, and that his liability to [the plaintiff] was limited to $6,000.

> The court then summarized the significant facts and rejected the defendant's argument, saying:

> > In the present case the terms of the written contract are clear and unambiguous. Under its provisions the only promise made by [the plaintiff] was to give up his right to acquire 248 shares of stock in [the corporation], in consideration of [the defendant's] promise to pay him $12,000 six months from [a specified date]. [The defendant's] promise to pay was absolute. It was neither expressly nor impliedly conditioned upon [the plaintiff's] signing a release so [the defendant] might obtain $6,000 from [the mortgage

company]. Thus, [the plaintiff's] refusal to sign the release was not
wrongful and in excess of his legal rights under the expressed or
implied terms of the written contract. [The defendant's] failure to
qualify his promise, so as to make the failure of [the plaintiff] to
sign a release an available excuse for not paying $6,000 of the
$12,000, rendered unavailable the alleged condition as a defense
against a recovery for nonperformance.

…

… [I]t would reasonably appear that if it was intended that [the
defendant's] payment of the $12,000 was conditioned upon [the
plaintiff's] signing a release, the contract prepared at [the
defendant's] direction would have been expected to include the
said condition as a part of the written contract … It is thus apparent
that [the defendant] assumed the risk, which was known to him
when the contract was entered into.

*Id.* So, too, in this case, the requirement that Acheron obtain an FSS contract is not qualified by

a requirement that Cook submit to an OIG audit. No such obligation on behalf of Cook is found

in the Agreement, and the prevention doctrine does not create one.[9]

Acheron also suggests that the Indiana Commercial Code ("ICC") supplies the requisite

duty. Indiana Code § 26-1-1-203 provides that every contract governed by the ICC "imposes an

obligation of good faith in its performance or enforcement." However, this provision applies to

"a specific duty or obligation under the contract," Comment to Uniform Commercial Code § 1-

203; it does not create a duty where none exists. *Cf. McArdle v. Peoria Sch. Dist. No. 150,* 705

---

[9]None of the cases cited by Acheron with regard to the prevention doctrine suggest
otherwise. Each of them involved the failure of a party to perform a duty that existed in the
contract. *See Rogier,* 734 N.E.2d 606 (contract created exclusive right to sell and therefore
defendant had a duty not to hinder plaintiff's ability to make sale); *Hamlin v. Steward,* 622
N.E.2d 535 (Ind. App. 1993) (duty of fulfillment of condition precedent—sale of motel—rested
in defendant, who therefore had a good faith effort to fulfill it); *AquaSource, Inc. v. Wind Dance
Farm, Inc.,* 833 N.E.2d 535 (Ind. App. 2005) (same; condition precedent was requirement of
approval by AquaSource's board, which AquaSource had a duty to make a good faith effort to
bring about); *A.L. Maddox v. Wright,* 489 N.E.2d 133 (Ind. App. 1986) (plaintiff had duty to
accept payoff from defendant and refusal to do so excused defendant's nonperformance);
*Billman v. Hensel,* 391 N.E.2d 671 (Ind. App. 1979) (condition precedent was purchasers
obtaining financing; purchasers failed to make good faith effort to do so).

F.3d 751, 755 (7th Cir. 2013) ("The obligation of good faith and fair dealing is used as an aid in construing a contract under Illinois law, but does not create an independent cause of action. Nor does it permit a party to enforce an obligation not present in the contract."); *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) (also applying Illinois law) ("Rather, the implied covenant of good faith is used as a construction aid to assist the Court in determining whether the manner in which one party exercised its discretion under the contract violated the reasonable expectations of the parties when they entered into the contract."). If the Agreement had imposed a duty on Cook to cooperate in an OIG audit, or assist Acheron in obtaining an FSS contract, then it would have had a duty to do so in good faith. But no such obligation is placed on Cook by the Agreement.

Next, Acheron argues that "it is well settled under Indiana law that, unless the contract provides otherwise, all applicable law in force at the time of entry into the agreement impliedly forms a part of the agreement without any need for a statement to that effect." Dkt. No. 67 at 23. Acheron further invokes the *Christian* doctrine, pursuant to which applicable federal regulations are incorporated into federal contracts. Thus, Acheron argues,

> 48 CFR § 515.408(b)(5) would have been read into any FSS contract between VA and Acheron in its role as reseller of Cook Medical's products. By the same token, those requirements must also be read into the Agreement between Cook Medical and Acheron, under which Acheron was to obtain an FSS to sell Cook Medical's products, and under which Cook Medical would directly reap benefits.

Dkt. No. 67 at 24. Acheron cites no authority for the extension of the *Christian* doctrine beyond federal contracts to contracts between private parties that relate to federal contracts. Further, as Cook points out, the regulation cited by Acheron did not place any obligation on Cook, as the party to be represented by Acheron. Rather, they obligated Acheron, as a "dealer/reseller without significant sales to the general public," to obtain and provide certain information from

Cook in its application for an FSS contract. Therefore, while under Indiana law "[a]ny agreement between the parties must be considered in conjunction with applicable statutes that govern the relationship," the regulation at issue did not govern the relationship between Acheron and Cook, but rather Acheron's relationship with the VA.[10]

Finally, Acheron argues that Cook "waive[d] any right it had to refuse to cooperate with the VA OIG's request for information regarding its sales records" by "sign[ing] a written statement expressly authorizing the VA to have access to its sales records" and by Walters' statement to Acheron that "[w]e are good to go" with regard to the audit, followed by the two emails to officials of the VA, one dated January 27, 2015, and the other dated February 27, 2015, in which he expressed Cook's willingness to cooperate with the OIG audit. Dkt. No. 54 at 20-21. However, the Agreement did not give Cook the "right to withhold its cooperation with the audit"; rather, the Agreement did not obligate Cook to do so. Acheron therefore is not really arguing that Cook waived its rights under the Agreement; rather, it is arguing that Cook undertook additional obligations not set forth in the Agreement. However, the Agreement contains both an integration clause—thus barring any additional obligations being added by actions prior to its execution—and a provision that no amendment to it "shall be binding on the

---

[10]Acheron's argument that "[r]ead into the Agreement, Section 515.408(b)(5) made it mandatory for Cook Medical, as a matter of law, to allow the VA access to its sales records where, as here, (i) Acheron was a reseller representing its products, (ii) Acheron did not have significant sales to the general public, and (iii) the sales under the resulting FSS contract were expected to exceed $500,000" is simply incorrect. Dkt. No. 67 at 24. The regulation made it mandatory for VA to require certain information from Acheron before awarding it an FSS contract. It imposed no obligation on Cook to provide that information.

parties unless reduced to writing and duly executed by Cook and [Acheron]," Dkt. No. 1-1 at 9, which neither the written authorization[11] nor the emails from Walters satisfy.

In addition to the failure to cooperate with the OIG audit, Acheron alleges that Cook breached the Agreement by refusing to deactivate Cook's DAPA, thereby "effectively preventing Acheron from making any Endoscopy sales to the DOD through its own DAPA." Cook again points out that the Agreement does not require it to deactivate its own DAPA, and, indeed, contemplates that it would continue to sell directly to the DOD and the VA; it simply would be required to pay Acheron commission on those sales. While Acheron asserts that its sales to the DOD were to occur via its DAPA and distinguishes between those sales and sales to the VA by means of an FSS contract, the Agreement in fact does not provide for any payment of commission by Cook to Acheron (other than on Cook's own sales) until "[a]fter the date [Acheron] obtains its Federal Supply Schedule contract." Dkt. No. 1-1 at 5. Acheron argues that "acceptance of this extreme interpretation of the Agreement would effectively read a central provision—Article I, ¶ 1 appointing Acheron as exclusive distributor of Endoscopy products— out of the Agreement" and cites 2A C.J.S. Agency § 325 for the proposition that "[a] principal who grants an exclusive territory to an agent for the sale of the principal's products may not compete with the agent in selling the products in the territory." However, that same section also provides:

> A contract which creates an exclusive agency to sell will not be held to create an exclusive right to sell, thus prohibiting direct sale by the principal, unless the contract expressly confers such exclusive right upon the agent or contains other language indicating that the parties intended to prohibit a direct sale by the principal or to guarantee the agent a commission in the event of such a sale. Although the agency contract need not expressly designate the agency as an

---

[11]The parties dispute the date on which the written authorization was signed by Walters. There is no dispute, however, that it was not signed by Acheron and that it does not purport to be an amendment to the Agreement.

exclusive agency, an intent to give an agent the exclusive right to sell in a territory must appear from unequivocal terms or by necessary implication.

2A C.J.S. Agency § 325 (footnotes omitted).  The Agreement in this case does not evince an intent to give Acheron the exclusive right to sell in the territory, thereby precluding direct sales by Cook.  To the contrary, the Agreement contemplates such direct sales will continue, expressly referring to commissions being based, in part, on the "selling party."  Dkt. No. 1-1 at 5.  It is this contract term that would be rendered superfluous if "exclusive distributor" were read to create an exclusive right to sell rather than just an exclusive agency to sell.

For the reasons set forth above, the Court finds that the Defendants are entitled to summary judgment on Acheron's breach of contract claim, both as it relates to the OIG audit and DAPA sales.  Accordingly, the Defendants' motion for summary judgment is **GRANTED**.

### B.  Acheron's Motion for Summary Judgment

Acheron's motion for summary judgment on its own breach of contract claims is **DENIED** in light of the Court's ruling above.

Acheron also moves for summary judgment on Cook's counterclaim against it for breach of contract.  Besides arguing that it is entitled to summary judgment on the counterclaim for the reasons already discussed in the context of Cook's motion for summary judgment, Acheron advances two additional arguments.  First, it points to the statement by Walters in his April 6, 2015, email that despite the fact that Acheron would no longer be pursuing an FSS for Cook's products, "As I stated on our last call, the contract remains in place and we will continue to consider business opportunities with Acheron under the terms and conditions of that agreement," Dkt. No. 55-6 at 3, and argues that "Cook Medical also relinquished its ability to terminate the Agreement based on Acheron's alleged 'breach' of its obligation to obtain an FSS when it elected to continue the Agreement after notifying Acheron that it had failed in that obligation and

that Cook Medical would no longer participate in efforts by Acheron to obtain an FSS to sell its products." Dkt. No. 54 at 24. Acheron fails to cite any cases that suggest that Indiana follows the principles cited by Acheron, as set forth in the Restatement (First) of Contracts § 309 and 5 Williston on Contracts § § 684, 687-88 (Rev. Ed. 1961). In any event, as described by Acheron, those principles apply to an "electing party [that] has continued to accept benefits under the contract." Dkt. No. 54 at 25. Acheron points to no benefits that Cook received under the contract after the April 6, 2015, email, nor does it explain what Walters could have meant by "the contract remains in place." Cook was under no obligation to pay Acheron any further commission under the Agreement unless and until it obtained an FSS for Cook's products, and there is no dispute that Acheron would not be doing so. Therefore, while Walters may have wanted to salvage some sort of relationship between the two parties, and while he might have believed that relationship could be governed by the Agreement, it could not.

Acheron also argues that once Cook elected to terminate the agreement, it then could not seek damages for its breach. That argument is without merit and is not supported by the case cited by Acheron. Rather, that case specifically notes that "[t]he doctrine of election of remedies applies only where a party has chosen one remedy and later pursues another remedy which is repugnant to or inconsistent with the remedy selected." *Parke v. First Nat. Bank of Elkhart*, 571 N.E.2d 1317, 1319 (Ind. App. 1991). Acheron does not explain how it would be inconsistent for Cook to seek damages caused by Acheron's breach after terminating the contract because of that breach. Accordingly, Acheron has not demonstrated that it is entitled to summary judgment on Cook's counterclaim.

# IV.  CONCLUSION

For the reasons set forth above, the Plaintiff's motion for summary judgment (Dkt. No. 53) is **DENIED**; the Defendants' motion for summary judgment (Dkt. No. 56) is **GRANTED**; the Plaintiff's Motion for Leave to Amend Its Appendix of Evidence in Support of Its Motion for Partial Summary Judgment (Dkt. No. 73) is **GRANTED** and the Clerk is directed to note on Dkt. No. 55 that it has been replaced by Dkt. No. 73; and the Defendants' motion to file a surreply (Dkt. No. 79) is **DENIED**.  The Court will request that Magistrate Judge Brookman meet with the parties to determine what remains to be done in this case, which now proceeds only as to the counterclaim, so that a new trial date can be set.

SO ORDERED: 9/28/17

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification