# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| ACHERON MEDICAL SUPPLY, LLC, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Cause No. 1:15-cv-1510-WTL-MPB ) |
| COOK INCORPORATED, et al., | ) ) |
| Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

A bench trial was held in this case before the undersigned beginning on April 23, 2019, on the counterclaim of Cook Medical LLC ("Cook").[1] The Court, having considered the evidence submitted at trial, as well as the parties' post-trial submissions, hereby makes the following findings of fact and conclusions of law.

In July 2014, Cook and Counterclaim Defendant Acheron Medical Supply, LLC, ("Acheron") entered into a five-year Distribution Agreement (the "Agreement"). Pursuant to the terms of the Agreement, Acheron was to serve as a distributor (or reseller) of certain of Cook's medical devices and products to the Department of Defense Medical Centers ("DOD") and the Veterans Administration ("VA"). Specifically, the Agreement stated that Acheron was appointed as Cook's exclusive distributor to the DOD and VA for the products and devices of Cook's Endoscopy business unit and a non-exclusive distributor for the products of its other business units. Acheron, which had been formed in July 2013, qualified as a small business for purposes of certain government set-asides, whereas Cook did not; therefore, by utilizing Acheron

---
[1] Acheron's claims against Cook were resolved in favor of Cook at the summary judgment stage.

as a distributor, Cook could make more sales to the VA and DOD than it could by selling to them directly.

The Agreement provides that "[Acheron] will obtain a Federal Supply Schedule contract and use it to sell the Products." A Federal Supply Schedule contract ("FSS") is one type of Multi-Award Schedule contract that the VA enters into with suppliers covering the sale of goods and services to the VA; the Agreement also contemplates that sales would be made under various other types of government contract vehicles. The Agreement further provides that

> Cook will pay [Acheron] a commission of 3 percent (3%) of the purchase price on all Endoscopy Products sold by [Cook] in the Territory between March 1, 2014 and the date [Acheron] obtains its Federal Supply Schedule contract, provided such Federal Supply Schedule is obtained by the end of the 2014 calendar year. After the date [Acheron] obtains its Federal Supply Schedule contract Cook will pay [Acheron] a commission on Products that are approved on its Federal Supply Schule contract at the time of the sale, in accordance with the applicable rate (depending on selling party, method of sale, etc.) as set forth in the commission schedule attached to this Agreement as Exhibit A.

The parties stipulate that Cook paid Acheron commissions in the amount of $116,317.81 pursuant to this provision, which was based upon sales made by Cook to the VA and DOD between March 1, 2014, and December 31, 2014.

It is undisputed that Acheron did not obtain an FSS. It is also undisputed that Acheron was unable to obtain an FSS because the VA's Office of Inspector General ("OIG") would not award an FSS to Acheron unless Cook underwent an OIG audit. The OIG audit of Cook was required by the VA because Acheron was a new company that did not have a record of significant sales to the public; therefore, in order to determine whether Acheron's proposed pricing of Cook's products was fair and reasonable, the VA needed to review Cook's commercial sales records. Cook had not anticipated that it would have to provide the extensive information required by the VA in order for Acheron to obtain an FSS; in fact, Ron Walters

2

testified that he was shocked to learn that it was being requested. Cook ultimately refused to undertake the burden of the OIG audit. After it was apparent that Acheron would be unable to obtain an FSS audit, Cook attempted to salvage a relationship with Acheron—after all, there were other means by which sales could be made to the VA besides an FSS—but ultimately decided to exercise its right to terminate the contract pursuant to the following provision in the Agreement:

> Cook may terminate this Agreement effective immediately upon written notice to [Acheron] of the occurrence of a material breach by [Acheron] of any of its essential contractual obligations contained in this Agreement, which is not cured by [Acheron] within thirty (30) days after receiving written notice of the breach from Cook.

In its counterclaim, Cook asserts a breach of contract claim against Acheron based upon Acheron's failure to obtain an FSS. Cook asserts that it is entitled to a return of the $116,317.81 it paid to Acheron pursuant to the Agreement as damages for the breach.[2]

The Court finds that Acheron's admitted inability to obtain an FSS was a material breach of the Agreement.[3] However, the Court finds that Acheron was excused from this breach by the force majeure clause in the Agreement.

---

[2] Cook acknowledges that its actual damages from the breach are the loss of its profits from the increased sales of its products to the DOD and the VA contemplated by the Agreement, but concedes that the amount of those lost profits is too speculative to form the basis of a damages award.

[3] Acheron points to testimony from Ron Walters from trial that it argues demonstrates that obtaining an FSS was not an essential requirement of the Agreement. However, the evidence as a whole, including Walters' testimony as a whole and, most importantly, the Agreement itself—proves the contrary. The (undisputed) fact that an FSS was not the only means of making sales to the VA—which is all that the testimony pointed to by Acheron expresses—does not render Acheron's obligation to obtain an FSS nonessential. Rather, the evidence as a whole demonstrates that obtaining an FSS would have provided additional benefits to Cook, and those benefits were an essential part of its bargain with Acheron.

3

"A force majeure clause is defined as a 'contractual provision allocating the risk if performance becomes impossible or impracticable, esp. as a result of an event or effect that the parties could not have anticipated or controlled.'" *Specialty Foods of Indiana, Inc. v. City of S. Bend*, 997 N.E.2d 23, 26 (Ind. Ct. App. 2013) (quoting *Black's Law Dictionary* 674 (8th ed. 2004)). However,

> the scope and effect of a force majeure clause depends on the specific contract language, and not on any traditional definition of the term. In other words, when the parties have defined the nature of force majeure in their agreement, that nature dictates the application, effect, and scope of force majeure with regard to that agreement and those parties, and reviewing courts are not at liberty to rewrite the contract or interpret it in a manner which the parties never intended. The party seeking to excuse its performance under a force majeure clause bears the burden of proof of establishing that defense.

*Id.* at 27 (citations and internal quotation marks omitted).

The force majeure provision in the Agreement provides:

> Neither COOK nor any Affiliate nor [Acheron] shall be liable for any delay or default caused by force majeure, including, without limitation . . . act of government or . . . agency . . . . The party affected by such a condition shall use every reasonable effort to correct or eliminate the cause which prevents performance and resume performance as soon as possible.

It is undisputed that Acheron was unable to obtain an FSS because the VA—a government agency—required information from Cook that Cook was unwilling to provide. Thus, it was an act of a government agency—the insistence that Cook submit to an OIG audit—that caused Acheron to breach the agreement. By the plain language of the Agreement, Acheron is not liable for that breach.

Cook argues that

> Black's Law Dictionary defines as "[a]n event or effect that can be neither anticipated nor controlled," and "an unexpected event that prevents someone from doing or completing something that he or she had agreed or officially planned to do." BLACK'S LAW DICTIONARY (10th ed. 2014). The clause is not written to excuse performance in the event of any government act. It must be a force

4

> majeure – a government act that "can be neither anticipated nor controlled," or a government act that is "unexpected."
>
> The Distribution Agreement's sole focus was an arrangement for contracting with and making sales to the United States government. If the government triggers the operation of the force majeure clause simply by sending a request for an audit then Acheron's obligations to obtain an FSS contract become illusory as do other obligations under the Distribution Agreement. Under Acheron's interpretation, no matter what the government's reasoning for denying an FSS application, Acheron should be excused from this material obligation. If the government buys less than anticipated, Acheron should be excused of the defined sales goals. Such an interpretation would render Acheron's performance obligations under the contract illusory meaningless, and the contract thereby unenforceable.

Dkt. No. 141-1 at 14-15. The Court rejects this argument. The evidence establishes that the OIG audit requirement—specifically, the extent of information that Cook would be required to provide to the government—*was* unanticipated by the parties; indeed, as noted above, Walters was shocked by it. It is undisputed that the parties had no control over it; all agree that there was no way for Acheron to obtain the FSS without the audit. Applying the force majeure clause to this situation does not render Acheron's obligation to obtain an FSS illusory; it simply recognizes that the Agreement did not require Acheron (or Cook) to fulfill an obligation that was rendered impossible by an unanticipated event out of its control.

The Court further finds that even if Acheron's breach was not excused by the force majeure clause, Cook would not be entitled to the damages it seeks—a return of the payments it made under the Agreement. Cook asserts that those payments were "conditioned on Acheron obtaining an FSS contract by the end of calendar year 2014." Dkt. No. 141-1 at 10. The Court finds that the relevant contract provision is ambiguous on this point. The Agreement provides that the payments are to be made "provided such Federal Supply Schedule is obtained by the end of the 2014 calendar year." This could be read as making the payments conditional, but it also could be read as simply ending Cook's obligation to make the payments as of December 31,

5

2014, or when an FSS was obtained, whichever came sooner. The evidence compels the conclusion that the parties intended the latter. If the commissions were only payable if an FSS were obtained by the end of 2014, then either they would not have been made until an FSS was obtained or the Agreement would have provided for their repayment if an FSS was not obtained by that date. But they were made on an ongoing basis, there is no such repayment provision, and, consistent with Walters' testimony about his understanding of the provision, Cook did not ask for repayment when 2014 ended without an FSS in place.

Cook also argues that the payments constitute an appropriate measure of damages for Acheron's breach. As Cook correctly recognizes, "the measure of damages in a breach of contract case is the loss actually suffered by the breach." Dkt. No. 141-1 at 11 (citing *Dana Companies, LLC v. Chaffee Rentals*, 1 N.E. 738, 748 (Ind. Ct. App. 2013)).

> It is axiomatic that a party injured by breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered. A party injured by a breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred. A damage award must be based upon some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances.

*L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012). Walters testified that the provision was added to the Agreement, and the payments were made by Cook, as consideration for the fact that Acheron had incurred expenses prior to the execution of the Agreement and would continue to incur expenses related to working with Cook and the government to establish the FSS and other contract vehicles to enable it to make sales of Cook's products to the VA and the DOD. Thus, those payments do not constitute a loss suffered by Cook as a result of the breach. Acheron performed the work and incurred the expenses for which those payments were compensation. And while the fact that that work did not ultimately obtain

6

the result contemplated by the Agreement—an FSS—may have caused Cook damages, Cook concedes that it may not recover those damages because they are too speculative, and Cook has not cited to any authority for the proposition that it may substitute as damages the payments it made to Acheron that were not made as consideration for obtaining an FSS, but rather as consideration for preliminary work performed by Acheron.

For the reasons set forth above, the Court finds that Acheron's inability to obtain an FSS constitutes a material breach of the Agreement, but that, by operation of the force majeure clause in the Agreement, Acheron is not liable to Cook for that breach. Alternatively, the Court finds that even if the force majeure clause did not apply, Cook would not be entitled to repayment of the commissions it paid to Acheron under the Agreement. Accordingly, the Court finds in favor of Acheron and against Cook on Cook's counterclaim.

SO ORDERED: 6/24/2019

*William T. Lawrence*

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification